## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| GEORGE EVANS, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION** |
| | ) | **NO. 14-40042-DHH** |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

### September 30, 2016

Hennessy, M.J.

    This matter is before the Court on the Defendant the United States of America's Motion for Summary Judgment.   (Docket #25).   The Plaintiff George Evans has filed a response (docket#35), and the motion is now ripe for adjudication.  For the reasons that follow, the Motion for Summary Judgment is ALLOWED.

I.      BACKGROUND[1]

    On August 8, 2008, the Massachusetts Department of Conservation and Recreation ("DCR") issued an order of quarantine for several towns in central Massachusetts to prevent the human-assisted spread of Asian Longhorn Beetle ("ALB"), a destructive insect known to infest,

---

[1] The following recitation of facts is assumed as true only for purposes of the instant motion.

among other species, maple trees.[2]  (DF 1, 4).[3]  The DCR quarantine prohibited any person from harvesting, cutting, moving, carrying, transporting, or shipping "regulated articles" (i.e. trees and tree products) within or outside the affected area.  (Docket #27-4 at 3-4).  The regulated area included a portion of the City of Worcester.  (DF 4). DCR periodically issued orders expanding the area of the quarantine along with maps of the regulated areas.  (DF 5; Docket #27-4).

On December 22, 2008, the United States Department of Agriculture ("USDA"), through its agency, the Animal Plant Health Inspection Service ("APHIS"), entered into an agreement, the ALB Cooperative Eradication Program Cooperative Agreement (the "Cooperative Agreement"), with the DCR codifying a joint action plan to eradicate ALB from the quarantine zone.[4]  (DF 6-7). The Cooperative Agreement indicated that APHIS and the DCR would be involved with "[t]he destruction of infested and high risk host trees" and the "[r]eplacement of trees lost to ALB with non-host species on public and private property." (DF 8).  Pursuant to the Cooperative Agreement, APHIS agreed to "[p]rovide personnel to accomplish operational activities" as well as "a project manager who shall be responsible for coordinating project activities with [DCR] including planning, decision-making, management, implementation and execution" and "any other activity leading to the control and eradication of the ALB."  (Id.).  DCR agreed to "[s]ecure a cost competitive tree removal contract" and "[p]rovide the resources and management to administer the contract." (Id.).

---

[2] ALB, which is not native to the United States, was transported to this country by burrowing within hardwoods that were cut into crates and pallets used to import goods into the United States from Asian countries.  (DF 1).  ALB was first reported in Massachusetts in August 2008.  (DF 3).

[3] The term "DF" refers to Defendant United States' facts.  The United States' facts can be found in its Statement of Undisputed Facts.  (Docket #27).

[4] Although not all signatories to this agreement, the ALB Cooperative Eradication Program is a partnership between APHIS, the United States Forest Service, the DCR, the Massachusetts Department of Agricultural Resources, and the City of Worcester.  (Docket #27-1).

DCR solicited bids and entered into contracts with private contractors to cut down trees designated as ALB host or infected trees. (DF 9). A "host tree" is a member of a certain species of tree that is susceptible to infestation by ALB, including elm, ash, and all sub-species of maple. (DF 13). On December 10, 2008, the DCR promulgated bid specifications for these contracts (the "FAC 47"). (Docket #27-8). Under the FAC 47, tree cutting contractors and their employees "shall not enter any private property unless [it] is in receipt of a Permission Slip from the property owner . . . prior to . . . any tree removals." (Id. at 11).

As part of the eradication process, the ALB Cooperative Eradication Program sent men and women to visually survey trees in the quarantine area. (DF 16). Pursuant to the survey protocol, the inspectors marked infested trees with red paint and uninfested host trees with blue paint. (Docket #27-2 at 15). Because the community was not in favor of removing uninfested host trees, decisions on whether to remove uninfested host trees were made on a case-by-case basis. (DF 18). Under the ALB Eradication Program protocol, property owners were given the choice of whether to allow removal of uninfested host trees. (DF 21). DCR provided a notice to affected property owners indicating that infected trees, those marked with red paint, were required to be removed; however, uninfested host trees, those marked with blue paint, could be removed upon the property owner's consent, but would not be removed without consent. (Docket 27-2 at 17; Docket #27-10). A form entitled "Acknowledgement and Permission" was attached to the notice which was to be filled out by the property owner to indicate whether the property owner authorized the DCR to remove uninfested host trees on the property. (Docket #27-10).

In December of 2008, the ALB Eradication Program identified a 2.2 square mile area within the City of Worcester which was targeted for removal of infested trees and for seeking

permission to remove uninfested host trees.  (Docket #27-2 at 13-14).  Evans' property was located within this area.  (DF 20).

Prior to tree removal, ALB Eradication Program personnel prepared color coded maps of the quarantine area that showed whether individual property owners had given written permission for their uninfested host trees to be removed.   (Docket #27-2 at 23;  Docket #27-9 at 9-10). Properties marked in red indicated that the property owner had not given permission to remove uninfested host trees, properties marked in blue indicated that the property owner had given permission to remove uninfested host trees, and properties marked in white indicated that the ALB Eradication Program did not have a signed permission form from the property owner.  (Docket #27-9 at 11-12).  Program monitors and tree cutters used these maps to determine which trees to remove and whether homeowner permission had been obtained.  (DF 25).  According to the procedure in place during the relevant time period, no action would be taken if a signed permission form had not been obtained.  (Docket #27-9 at 12).  In addition to the maps, Program monitors were given a listing of properties within the area they were overseeing that included notes on the permission status of the property.  (Id. at 17-20).

On December 31, 2008, DCR entered into a tree removal contractor with Mayer Tree Service, Inc.  (Docket #35-8).  Mayer entered into a tree removal subcontract with Marquis Tree Service on January 5, 2009.  (Docket #35-9).

On January 9, 2009 APHIS issued a federal order quarantining a portion of Worcester County, Massachusetts.  (DF 6).  Unlike the DCR quarantine, the APHIS quarantine mandated regulation of interstate movement of ALB "regulated articles" (i.e. trees and tree products).  (Id.). The order described the boundaries of the regulated area.  (Id.).

4

Crystal Franciosi was a Plant Protection and Quarantine technician with APHIS who oversaw tree removal on February 9, 10, and 11, 2009.  (DF 26).  On February 10 and 11, 2009, twenty-two Norway Maple trees were removed from Evans' property by Marquis.[5]  (DF 26, 27). Franciosi reported that she had map permission to remove the trees from Evans' property.  (DF 28).  However, the listing of properties included the notation, "need release," with respect to Evans' property.  (DF 29).  After an investigation by a supervisory investigator with APHIS Investigative and Enforcement Services, no records were found that would indicate that Evans ever signed a form giving permission for the removal of his host trees.  (DF 30).  On February 20, 2009, after the host trees had already been removed, DCR sent Evans a written notice of the removal and an attached permission form.  (DF 31).  The notice was dated December 10, 2008. (Docket #27-10 at 4).

II.    STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial."  Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  Moreover, the Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993).  Even so, the Court is to ignore "conclusory

---

[5] There is some dispute as to the number of trees that were removed from Evans' property.  However, for purposes of this motion, that dispute is not material.  It is undisputed that a certain number of trees were removed from Evans' property without his permission.

allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted).

III.    ANALYSIS

"The United States as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586 (1941) (internal citations omitted).  The Federal Tort Claims Act ("FTCA") "provides a 'carefully limited waiver' of the federal government's sovereign immunity for certain claims alleging harm caused by United States employees or agents." Carroll v. United States, 661 F.3d 87, 93 (1st Cir. 2011) (quoting Bolduc v. United States, 402 F.3d 50, 62 (1st Cir. 2005)).  The FTCA allows civil actions against the federal government

> for injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).   "[T]he FTCA must be 'construed strictly in favor of the federal government, and must not be enlarged beyond such boundaries as its language plainly requires.'" Bolduc, 402 F.3d at 56 (quoting United States v. Horn, 29 F.3d 754, 762 (1st Cir. 1994)).

This statutory waiver of sovereign immunity comes with several exceptions.  28 U.S.C. § 2680.  The United States argues that two exceptions to the waiver apply in the instant case – the quarantine exception and the discretionary function exception.  (Docket #26 at 7-8).

A.    Quarantine Exception

The United States argues that Evans' claims fail because the removal of the trees was performed pursuant to ALB quarantine orders, and, therefore, those claims are barred by 28 U.S.C. § 2680(f).  (Docket #26 at 8).  Pursuant to 28 U.S.C. § 2680(f), "[a]ny claim for damages caused

by the imposition or establishment of a quarantine by the United States" is specifically exempted from the FTCA.  For the quarantine exception to apply, the damages must be proximately caused by the imposition or establishment of a quarantine by the United States.  <u>Rey v. United States</u>, 484 F.2d 45, 48 (5th Cir. 1973).  Damages incidental to the quarantine itself are not barred by the quarantine exception.  <u>Id.</u>

Pursuant to the Plant Protection Act (the "PPA"), the Secretary of Agriculture is authorized to "prohibit or restrict the importation, entry, exportation, or movement in interstate commerce" of plants and plant products if the Secretary determines that such a prohibition is necessary to prevent the dissemination of a plant pest in the United States.  7 U.S.C. § 7712(a).  The United States has promulgated regulations authorizing the Administrator of APHIS to impose quarantines in states in which the ALB has been found or in which the Administrator has reason to believe that the ALB is present.[6]  7 C.F.R. § 301.51-3(a).  On January 9, 2009, pursuant to these authorities, APHIS issued a quarantine on the <u>interstate</u> movement of ALB regulated articles from portions of Worcester County.  (Docket #27-6).

Evans correctly argues that nothing in the PPA or the ALB quarantine regulations authorizes the United States to regulate living, mature, stationary trees on private property.  (<u>See</u> Docket #34 at 10).  Instead, the removal of ALB infested or host trees in Worcester County in 2009 was grounded on orders issued by the DCR pursuant to its authority under sections 8, 11, and 12 of chapter 132 and section 1F of chapter 132A of the Massachusetts General Laws.[7]  (<u>See</u>

---

[6] The Administrator may designate less than an entire state as a quarantined area only if the state itself has adopted and is enforcing restrictions on the intrastate movement of regulated articles equivalent to those imposed by the United States on the interstate movement of those same articles.  7 C.F.R. § 301.51-3(a).

[7] Section 1F of chapter 132A of the Massachusetts General Laws provides that the bureau of forestry, a division of the DCR, shall be responsible for the insect suppression of public nuisances.  Section 12 of chapter 132 of the Massachusetts General Laws imposes civil liability upon any person who knowingly violates an order of quarantine imposed by the DCR relative to the suppression or eradication of ALB.

Docket #27-4; Docket #27-10).  Section 11 of chapter 132 of the Massachusetts General Laws authorizes the DCR to make rules and regulations for the purpose of suppressing the ALB.  Mass. Gen. Laws ch. 132, § 11.  Section 8 of that chapter permits DCR employees and agents to enter upon any land within the Commonwealth of Massachusetts to determine the existence of an infestation of ALB and to suppress and control ALB.  Mass. Gen. Laws ch. 132, § 8.  Pursuant to these authorities, the DCR imposed the August 8, 2008 quarantine and its periodically issued updates which authorized the DCR to make use of "all lawful means of suppressing, controlling and eradicating ALB, including . . . removing or causing to be removed, and the destruction thereof of all Regulated Articles," including living trees, within the quarantine area "that are, may be or have the potential to be infested or infected by ALB."  (Docket #27-4).  Consistent with this framework, the notice sent to homeowners indicating that ALB infested trees would be removed and seeking permission to remove host trees indicated that such trees were being removed pursuant to the DCR quarantine.  (Docket #27-10).

As the quarantine imposed by the United States was not the proximate cause of the destruction of Evans' trees – because the federal quarantine was a restriction on the movement of articles in commerce, and not a mandate for the destruction of ALB infested or host trees – the quarantine exception to the FTCA does not preclude Evans' claims.

B.    Discretionary Function Exception

Alternatively, the United States argues that Evans' claims are barred pursuant to the discretionary function exception.  (Docket #26 at 10).  This exception bars liability against the United States for:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal

agency or an employee of the Government, whether or not the discretion involved
be abused.

28 U.S.C. § 2680(a).  "The Supreme Court has observed that the discretionary function exemption 'marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.'"  Carroll v. United States, 661 F.3d 87, 99 (1st Cir. 2011) (quoting United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808 (1984)).  The discretionary function exception "immunizes conduct of government employees that arises from 'legislative and administrative decisions grounded in social, economic, and political policy,' protecting against 'liability that would seriously handicap efficient government operations.'"  Id. (quoting Wood v. United States, 290 F.3d 29, 36 (1st Cir. 2002)).

The discretionary function exception "poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction." Baird v. United States, 653 F.2d 440 (10th Cir. 1981); see Santoni v. Potter, 369 F.3d 594, 602 (1st Cir. 2004) ("If the discretionary function exception applies, the agency is completely immune from suit, and the claim must be dismissed for lack of subject matter jurisdiction.").  Because the exception applies "whether or not the discretion involved be abused," 28 U.S.C. § 2680(a), "the question of negligence is irrelevant to the applicability of the discretionary function exemption." Lopez v. United States, 376 F.3d 1055, 1057 (10th Cir. 2004), accord Valdez v. United States, No. 13-1606(SCC), 2015 U.S. Dist. LEXIS 31425, at *9 (D.P.R. Mar. 12, 2015).

There is a well-established framework used to determine the applicability of the discretionary function exception:  "A court must first identify the conduct that is alleged to have caused the harm, then determine whether that conduct can fairly be described as discretionary, and if so, decide whether the exercise or non-exercise of the granted discretion is actually or potentially

influenced by policy considerations." Id. (quoting Fothergill v. United States, 556 F.3d 248, 252 (1st Cir. 2009)). "If the conduct is both discretionary and policy-related, the discretionary function exception bars subject matter jurisdiction." Montijo-Reyes v. United States, 436 F.3d 19, 24 (1st Cir. 2006).

1.      The Allegedly Harmful Conduct

At the first step of the inquiry, the court must identify the allegedly harmful conduct, focusing "on the nature and quality of the harm-producing conduct, not on the plaintiff's characterization of that conduct." Fothergill, 566 F.3d at 252-53. The focus of Evans' complaints rests on the removal of his trees without first obtaining his permission.[8]  (Docket #10 at ¶¶ 29-33).

2.      The Nature of the Conduct

At the second step of the inquiry, the court must determine whether the allegedly harmful conduct "involves a matter that the political branches have left to the actor's choice." Fothergill, 566 F.3d at 253. "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." Berkovitz v. United States, 486 U.S. 531, 536 (1988), quoted in Sydnes v. United States, 523 F.3d 1179, 1184 (10th Cir. 2008) ("To overcome the discretionary function exception and thus have a chance of establishing a waiver of sovereign immunity, plaintiffs must show that the federal employee's discretion was limited by 'a federal statute, regulation, or policy;' after all, states can't waive the federal government's immunity."); see Carroll, 661 F.3d at 101 ("State law cannot override the FTCA's grant of immunity for discretionary conduct"). "In such circumstances, where 'the employee's conduct cannot appropriately be the product of judgment or choice, there

---

[8] While both parties choose to frame the harm around the failure to obtain permission, and the court decides this case based on the parties having framed the issue in that manner, the court also recognizes that the harm here could have simply been the removal of Evans' trees.

is no discretion in the conduct for the discretionary function exception to protect.'" <u>Carroll</u>, 661 F.3d at 100-01 (quoting <u>Berkovitz</u>, 486 U.S. at 536).  However, where "the government actors in question have latitude to make decisions and choose among alternative courses of action, the conduct is discretionary." <u>Bolduc</u>, 402 F.3d at 61.

In order to implement the PPA, the Secretary of Agriculture "may cooperate with . . . States or political subdivisions of States." 7 U.S.C. § 7751(a).  Under the PPA framework, the State "shall be responsible for the authority necessary to conduct the operations or take measures on all land and properties within the . . . State, other than those owned or controlled by the United States[.]" 7 U.S.C. § 7751(b)(1).  Evans argues that this federal statute bound the United States to follow whatever procedures the Commonwealth of Massachusetts enacted under its statutory authority, including the requirement that the property owner's permission be obtained prior to removing uninfested host trees, and, hence, the conduct of the United States that caused the removal of his trees was not discretionary. (Docket #34 at 14-15).

In <u>Lopez v. United States</u>, the Tenth Circuit considered whether the court had subject matter over plaintiffs' claim that the United States Postal Service ("USPS") negligently failed to take account of the driving public when locating a row of mailboxes on the shoulder of a highway or whether such claims were barred by the discretionary function exception to the FTCA. <u>Lopez</u>, 376 F.3d at 1057.  The plaintiffs argued that USPS regulations and administrative policy removed discretion from USPS employees to situate the mailboxes at the location in question because Section 632.524 of the Postal Operations Manual stated that mailboxes "must be placed to conform to state laws and highway regulations." <u>Id.</u> at 1057-58.  This requirement was reiterated in the Domestic Mail Manual, which provided that mailboxes must be placed "subject to state laws and regulations." <u>Id.</u> at 1058.  The Tenth Circuit found that these regulations demanded that applicable

state highway safety regulations be followed when determining mailbox locations, and, therefore, if mailboxes were placed in violation of state law or regulations, the USPS was compelled by its own regulations to relocate them.  Id.  The Tenth Circuit held that this was a nondiscretionary mandate.  Id.

Unlike the postal regulations in Lopez which affirmatively required the USPS to act in conformity with state law, the statute here, 7 U.S.C. § 7751(b)(1), does not limit or remove the discretion of the USDA.  Far from it, the statute places all responsibility for "the authority necessary to conduct the operations or take measures on all land and properties" on the entity cooperating with the USDA, here the Commonwealth.  The statute does not place any affirmative, nondiscretionary duty on the United States.  Cf. Lopez, 376 F.3d at 1058 (holding that USPS regulations compelled USPS to relocate mailboxes placed in violation of state law or regulations where USPS manual stated mailboxes "must be placed to conform to state laws and highway regulations") (emphasis added).  If the Commonwealth failed to obtain the permission it unilaterally agreed it would obtain before removing trees, then, under federal law, "responsibility" lies with the Commonwealth.[9]  Evans' argument is predicated on a reading of the statute that the Commonwealth's responsibility ends when it adopts a protocol to obtain authority to enter on land within the Commonwealth.  But the statute does not so limit the responsibility of the Commonwealth.  Without exception, it places responsibility for the authority necessary to conduct operations on the Commonwealth.  Hence, this court finds that the United States did not adopt DCR's practice of obtaining property owners' written consent prior to removing uninfected host trees so that this practice had the effect of a federal statute, regulation, or policy.  This reading of

---

[9] I note that the issue of whether this practice was binding on the DCR is currently being litigated at the state level. See Evans v. Mayer Tree Serv., Inc., 89 Mass. App. Ct. 137, 149-50 (2016).  The court need not reach that issue here as it finds that the discretionary function exemption is applicable.

the statute is consistent with the court's obligation to "construe [] waivers [of sovereign immunity] narrowly and to resolve any ambiguity or uncertainty in favor of immunity. <u>Abreu v. United States</u>, 468 F.3d 20, 30 (1st Cir. 2006).

While it finds the analysis above dispositive on the issue, the court also rejects Evans' argument that, by entering into the Cooperative Agreement, APHIS became an agent of the Commonwealth, and was thereby bound by any obligation the DCR unilaterally undertook. (Docket #34 at 13-15). While 7 U.S.C. § 7751(a) provides that the USDA may cooperate with a State to carry out the PPA, as stated above, there is no mention in the statute of any agency relationship. The court notes that the Cooperative Agreement itself never uses the word "agent." Instead it describes the relationship as "cooperative," noting that "[e]radication is achieved through the cooperative efforts of federal, state and local governments," and that "[t]hrough this mutually beneficial cooperative effort, MDCR and APHIS endeavor to identify where ALB is present[.]" (Docket #27-7 at 2). Pursuant to the Cooperative Agreement, APHIS agreed to "[p]rovide personnel to accomplish operational activities and objectives." (<u>Id.</u> at 4). The Cooperative Agreement states that these "[f]ederal personnel will be deployed to assist in related program activities as determined and agreed to by MDCR <u>and</u> APHIS." (<u>Id.</u>) (emphasis added). The Cooperative Agreement clearly contemplates a cooperative venture, rather than one in which the DCR has any right to control the actions of APHIS. Thus, the essential element of an agency relationship is missing. See <u>Hollingsworth v. Perry</u>, 133 S. Ct. 2652, 2666 (2013) ("An essential element of agency is the principal's right to control the agent's actions.") (quoting 1 Restatement (Third) of Agency § 1.01, Comment f (2005)).[10] Evans' construction of the Cooperative

---

[10] While <u>Hollingsworth</u> quotes the Third Restatement of Agency, this principal is equally applicable under the Second Restatement of Agency which Massachusetts follows. See <u>CNE Direct, Inc. v. Blackberry Corp.</u>, 821 F.3d 146, 150 (1st Cir. 2016).

Agreement, while suiting his theory of liability, would, in effect, allow a state government to limit the scope of the United States' sovereign immunity.  Case law clearly holds that the states do not possess such power.  See Sydnes, 523 F.3d at 1184; Carroll, 661 F.3d at 101.

Evans also argues that, because Marquis had yet to complete a compliance agreement prior to removing his trees, the United States did not have the authority to direct Marquis to remove those trees.  (Docket #34 at 15-16).  However, in accordance with the plain language of 7 U.S.C. § 7751(b), discussed above, even if Marquis was not authorized to remove trees, Section 7751 makes clear that responsibility for the authority to conduct operations lies with the Commonwealth.  Ensuring that tree removal contractors are qualified falls squarely within that requirement.  Moreover, the Cooperative Agreement places responsibility on the Commonwealth to "award and administer host tree removal contracts."  (Docket #27-7 at 6).  The responsibility of the United States, insofar as tree removal contractors are concerned, is only to provide the funds that the Commonwealth will utilize to award and administer those contracts.  (Id.).

Nothing in 7 C.F.R. § 301-51 requires a contrary result.  7 C.F.R. § 301-51-6 provides that:

> Persons engaged in growing, handling, or moving regulated articles interstate may enter into a compliance agreement if such persons review with an inspector each stipulation of the compliance agreement.  Any person who enters into a compliance agreement with APHIS must agree to comply with the previsions of this subpart [the regulations dealing with ALB] and any conditions imposed under this subpart.

A compliance agreement is defined as "[a] written agreement between APHIS and a person engaged in growing, handling, or moving regulated articles that are moved interstate, in which the person agrees to comply with the provisions of this subpart [the regulations dealing with ALB] and any conditions imposed under this subpart."  7 C.F.R. § 301-51-1.  Pursuant to the FAC 47, tree cutting contractors and their employees were to perform all work and services to eradicate the ALB in accordance with the Compliance Agreement.  (Docket #27-8 at 3).  Marquis signed a

compliance agreement with APHIS and the DCR on February 18, 2009, after the trees at issue were removed from Evans' property.  (Docket #35-2).  As an initial matter, there is no indication in the record that Marquis, which is located in Burlington, Massachusetts, handled or moved the trees interstate.  (See id.).  Hence, there is no independent requirement under 7 C.F.R. § 301-51-6 for the United States to enter into a compliance agreement with Marquis.  Even if it did handle or move regulated articles interstate, 7 C.F.R. § 301-51-6 places no affirmative requirement upon APHIS to enter a compliance agreement with Marquis.  The regulation is not directed at APHIS but rather those who seek to enter an agreement with APHIS and contains only permissive language, stating that such persons "may enter into a compliance agreement[.]"  7 C.F.R. § 301-51-6 (emphasis added).  Nor, for the same reasons explained above with respect to the permission provision, can the fact that the FAC 47 required tree cutting employees to perform all work and services in accordance with the Compliance Agreement override the FTCA's grant of immunity for discretionary conduct.

Pursuant to the FAC 47, tree cutting contractors and their employees were also required to perform all work and services to eradicate the ALB in accordance with the DCR quarantine order.  (Docket #27-8 at 3).  The DCR quarantine provides: "No person shall harvest, cut, move, carry, transport or ship (or authorize or allow any other Person to do the same) Regulated Articles [i.e. trees and tree products] within or outside of the Affected Area during the Quarantine Period unless specifically authorized in writing by the Commissioner of the [DCR]."  (Docket #27-4 at 4).  Evans asserts that this provision precluded the United States from directing Marquis Tree to remove any trees unless and until Marquis Tree was specifically authorized to so in writing by DCR.  (Docket #34 at 15).  As explained previously, however, state law cannot override the FTCA's grant of immunity for discretionary conduct.  See Sydnes, 523 F.3d at 1184; Carroll, 661 F.3d at 101

3.       Policy Considerations

At the final step of the inquiry, the court must determine whether Franciosi's decision to remove Evans' uninfested host trees without first obtaining his permission was arguably based on considerations of public policy.   "[T]he actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected."   United States v. Gaubert, 499 U.S. 315, 317 (1991).   "Where 'a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.'"   Limar Shipping Ltd. v. United States, 324 F.3d 1, 8-9 (1st Cir. 2003) (quoting Gaubert, 499 U.S. at 317).   First Circuit precedence places the burden on the plaintiff to show "that discretionary conduct was not policy-driven and, hence, falls outside the exception."   Carroll, 661 F.3d at 100 n.15.   But see Hart v. United States, 630 F.3d 1085, 1089 n.3 (8th Cir. 2011) (noting circuit split on whether the plaintiff or the government bears the burden of proof).

> The law imposes no requirement that the government, as a prerequisite to invoking the discretionary function exception, demonstrate that a policy judgment actually was made.   The discretionary function exception applies to all acts and omissions that are susceptible to policy analysis, whether or not that analysis has been performed on a given occasion.

Fothergill, 566 F.3d at 253.

Here, Evans makes no showing as to whether the conduct at issue was susceptible to policy analysis.   (Docket #34 at 15).   On this basis alone, having already found that the conduct was discretionary, summary judgment is granted and the case dismissed.   However, even if the court goes a step further, it still finds that summary judgment is appropriate.   The fact that there is no federal statute, regulation, or policy requiring property owner permission prior to removing ALB

uninfested host trees is, arguably, a policy decision to expedite the tree removal process thereby preventing the spread of ALB.  As recognized in the Cooperative Agreement, spread of the ALB has the potential to cause extensive losses to ornamental and commercial tree species.  (Docket #27-7 at 2).  Likewise, the lack of a federal statute, regulation, or policy requiring that tree removal contractors complete a compliance agreement or be authorized by the DCR is also an arguable policy decision made to expedite the tree removal process thereby preventing the spread of ALB.

Therefore, because the challenged conduct is both discretionary and policy-related, the discretionary function exception bars subject matter jurisdiction over this action.  See Montijo-Reyes, 436 F.3d at 24.

IV.    CONCLUSION

For the foregoing reasons, the United States' Motion for Summary Judgment (Docket #25) is hereby ALLOWED.


/S/ David H. Hennessy
David H. Hennessy
UNITED STATES MAGISTRATE JUDGE